**IT IS SO ORDERED.**


**SIGNED THIS: September 27, 2007**


_____
                 **GERALD D. FINES**
        **UNITED STATES BANKRUPTCY JUDGE**
_____


**United States Bankruptcy Court**
**Central District of Illinois**
**Danville Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| James J. Simone, | ) | Case No. 05-94720 |
| | ) | |
|         Debtor. | ) | |
| _____ | ) | |
| | ) | |
| James J. Simone, | ) | |
| | ) | |
|         Plaintiff, | ) | |
| v. | ) | Adversary No. 06-09040 |
| | ) | |
| United States of America, Indian | ) | |
| Health Service, | ) | |
| | ) | |
|         Defendants. | ) | |
| _____ | ) | |

United States of America,     )
     )
             Counter-claimant,  )
     )
v.     )
     )
James J. Simone,     )
     )
             Counter-defendant. )

## ORDER GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND ENTERING A MONETARY JUDGMENT AGAINST THE DEBTOR

### Findings of Fact and Conclusions of Law

This matter came to be heard in open court on September 13, 2007, with proper notice of hearing, on: (1) the United States' Motion for Summary Judgment (docket entry #56), seeking a monetary judgment against the debtor counter-defendant, James J. Simone, hereinafter called Simone, and an order denying the debtor's complaint for discharge of this debt (docket entry #1); (2) Simone's Response (docket #66) to said Motion for Summary Judgment; and (3) the United States' Reply (docket #71) thereto, with Simone being present in person and by his attorney Gus Regas, and the United States of America being present by Assistant United States Attorney David H. Hoff.

The United States, in its Motion for Summary Judgment, seeks a monetary judgment against Simone in the amount of $124,462.92 (as of May 1, 2007), plus interest accruing after May 1, 2007, until entry of judgment, plus post-judgment interest, and an order denying Simone's complaint to discharge this debt.

Simone's debt arose out of a statutory repayment obligation that was triggered when he breached his Indian Health Service's ("IHS") Loan Repayment Program contract by resigning one year into his two-year service obligation. Simone also breached the terms of the contract by misusing the money paid to him by IHS for repayment his pre-existing student loans, instead using it for a purpose other than repaying his educational loans. The statutory repayment obligation arises when a Loan Repayment Program participant fails for any reason to complete his full service obligation. In this case, Simone resigned from his position of employment with the Indian Health Service, tendering his resignation one year and five days after signing his Loan Repayment Program contract, in which he agreed to a two-year service obligation with the Indian Health Service.  As a result of Simone's resignation, he completed only 376 days of his two-year service obligation.

The United States, in its Motion for Summary Judgment, also requests that this Court refuse to discharge the debt in bankruptcy because Simone cannot meet the unconscionability standard required by statute (25 U.S.C. § 1616a(m)(4)) to discharge the debt. The United States contends that Simone has the financial ability to pay his Loan Repayment Program repayment obligation. In addition, the United States contends that Simone could not use the outstanding educational loan debt he owes to the United States Department of Education ("DOE") as a defense to this motion for summary judgment because he would owe significantly less to DOE if he had properly used the money he received from the Loan Repayment Program to pay down those

3

loans.

Simone has not submitted any legal authority challenging the United States' right

to the monetary judgment now sought in the Government's Motion for Summary

Judgment. Similarly, Simone has cited no legal authority supporting his argument that

an order declaring the Loan Program Repayment debt to be nondischargeable would be

unconscionable. Simone did not object to any statements of fact in the United States'

Motion for Summary Judgment and acknowledged during oral argument before this

Court that there are no disputed statements of material fact in the United States' Motion

for Summary Judgment. Simone challenged the facts stated at pp. 8–11 of the Parties'

Joint Pretrial Statement (docket # 27), but only for relevance and materiality. Those

objections are overruled.

This Court hereby grants the United States' Motion for Summary Judgment

denying the debtor's motion to discharge his indebtedness owed to the Indian Health

Service and entering a monetary judgment in favor of the United States and against the

debtor, James J. Simone, for $127,291.24, being the amount of the debt and interest

accrued through September 13, 2007, and also awarding post-judgment interest on said

judgment amount for the reasons set forth hereinbelow.[1]

---

[1] The factual citations in this Order are to the paragraphs in the Joint Pretrial
Statement (Docket Entry 27) and those items described on the List of Exhibits Submitted
Electronically in Support of the United States' Motion for Summary Judgment on May
11, 2007 (Docket Entry #34), which include:  Exhibits 1-34 to the Statement of Facts; the
Certified Statement of Disposition; the Declarations of David Azure, Barry Blum, Tom
Eaglestaff, and Jaccqueline Santiago; the Deposition of Dr. James Simone, and attached
exhibits to that Deposition.

4

## STATUTORY OVERVIEW

Title 28 U.S.C. §§157, 1334, and 1345, and Rule 7008 of the Federal Rules of

Bankruptcy Procedure vest this Court with subject matter jurisdiction to decide the

United States' counter-claim as a core proceeding.

The Indian Health Service is an agency within the United States Department of

Health and Human Services ("HHS" or "Secretary"). Its primary mission is to provide

health care services to American Indians/Alaska Natives. IHS pursues this mission in

accordance with its authorizing legislation, including the Indian Health Care

Improvement Act ("IHCIA"), codified at 25 U.S.C. §§ 1601–1683, which contains the

primary provision at issue in this litigation. In addition, IHS is bound by the mandates

of the Indian Child Protection and Family Violence Prevention Act ("the Act"), codified

at 25 U.S.C. §§ 3201–3210. Among other things, the Act imposes requirements on IHS

for protecting Indian children from potential abuse by federal employees.

I.   The Indian Health Care Improvement Act

The IHCIA serves as the authorizing legislation for numerous IHS programs,

including the Loan Repayment Program. 25 U.S.C. § 1616a. Congress intended the Loan

Repayment Program ("LRP") to further IHS' mission by "assur[ing] an adequate supply

of trained health professionals necessary to maintain accreditation of, and provide

health care services to Indians through, Indian health programs." 25 U.S.C.

§ 1616a(a)(1).

Persons interested in participating in the LRP submit an application to the

Rockville, Maryland, office of the LRP. Exhibit 30 p. 9 (IHS Loan Repayment Program

Information and Application). The Secretary, acting through IHS, determines who shall

receive loan repayment awards. 25 U.S.C. § 1616a(d)–(e). The awards are distributed

among the health professions, based on the relative needs of American Indians/Alaska

Natives for additional services in each of the professions. 25 U.S.C. § 1616a(d)–(e). In

exchange for a loan repayment award, the recipient must agree to serve in full-time

clinical practice in an Indian health program for a period of at least two years. 25 U.S.C.

§ 1616a(f)(1)(B)(iii). An individual's service for purposes of the LRP contract begins on

the date that the Secretary executes the LRP. 25 U.S.C. § 1616a(e)(1). Although the LRP

will help a program participant identify qualifying positions in which to fulfill his

service obligation, the LRP is not responsible for the hiring of the individual. Instead,

the participant must identify a qualifying position, apply for the position to the hiring

official, receive an offer of employment, and report the qualifying position to the LRP.

A LRP awardee who fails to fulfill his service obligation, "for any reason,"

becomes liable to the United States for the amount determined by the statute. 25 U.S.C.

§ 1616a(*l*)(2). The repayment obligation protects the aim of the statute, which is "to

assure an adequate supply of health professionals to the Service, Indian tribes, tribal

organizations, and urban Indian organizations involved in the delivery of health care to

American Indians and Alaska natives." 149 Cong Rec E 1215, 1216 (2003). Cancellation

of the obligation is permitted only upon: 1) death of the individual; 2) a waiver by the

Secretary for cases involving either impossibility or extreme hardship, and

unconscionability; or 3) discharge by a bankruptcy court that finds nondischarge would

be unconscionable. 25 U.S.C. § 1616a(m).

II.    <u>The Indian Child Protection and Family Violence Prevention Act</u>

As a condition for both participation in the LRP, 25 U.S.C. § 1616a(b)(2), and

federal employment, an individual must qualify for Federal employment. The Indian

Child Protection and Family Violence Prevention Act ("the Act"), codified at 25 U.S.C.

§§ 3201–3210, establishes "minimum standards of character" for certain Federal

positions. 25 U.S.C. § 3207 (1994 & Suppl. IV 1999). Introduced by Senator John McCain,

Congress adopted the Act after reported abuse of Indian children in schools operated

by the Bureau of Indian Affairs. S. 2340, 101st Cong., 136 Cong. Rec. 3284 (1990)

(enacted). As stated by Senator McCain, "[i]n each of these tragic cases Indian children

who were the victims of sexual abuse were in turn victimized by the failure of the

Federal government to respond to their needs." <u>Id.</u> He went on to state that "[e]ach year

thousands of Indian children are victims of physical abuse and neglect. Little assistance

has been provided by either the Bureau of Indian Affairs or the Indian Health Service to

improve efforts of Indian tribes to provide adequate child protection services on the

reservations." <u>Id.</u>

In passing the Act, Congress concluded that "multiple incidents of sexual abuse

of children on Indian reservations have been perpetrated by persons employed or

funded by the Federal Government." 25 U.S.C. § 3201(a)(1)(c) (1994 & Suppl. IV 1999).

Furthermore, Congress indicated that the "Federal Government investigations of the

background of Federal employees who care for, or teach, Indian children are often

deficient." 25 U.S.C. § 3201(a)(1)(D) (1994 & Suppl. IV 1999). Congress intended for the

measures laid out in the Act to reduce incidents of such abuse. 25 U.S.C. § 3201(a)(2)(A)

(1994 & Suppl. IV 1999).

One of those measures dictates the terms under which IHS may employ certain

individuals in specified positions. The Act requires IHS to investigate employees who

are serving in positions where they have "regular contact with, or control over, Indian

children" to ensure that the persons serving in these positions meet "minimum

standards of character." See 25 U.S.C. § 3207(a)(1) (1994 & Suppl. IV 1999). By

determining that each employee who serves in these positions meets the minimum

standards of character, IHS helps "ensure that Indian children are protected." 42 C.F.R.

§ 136.402.[2] When an individual is determined not to meet these minimum standards,

Congress has prohibited their employment in such positions. 25 U.S.C. § 3207(b) (1994

& Suppl. IV 1999). Thus, IHS may not employ any individual in a § 3207(a)(1) position if

that person has "been found guilty of, or entered a plea of nolo contendere or guilty to,

any offense under Federal, State, or tribal law involving crimes of violence; sexual

assault, molestation, exploitation, contact or prostitution; or crimes against persons." 25

---

[2] Pursuant to the Act, IHS promulgated regulations in 2002. See 42 C.F.R. §§
136.401–136.418.

U.S.C. § 3207(b) (1994 & Suppl. IV 1999).[3] Once IHS discovers that an employee has

been found guilty of or entered a plea to one of these offenses, "IHS must deny

employment to an individual or dismiss an employee, when the duties and

responsibilities of the position the individual person would hold or holds involve

regular contact with or control over Indian children." 42 C.F.R. § 136.416.[4]

## STATEMENT OF FACTS NOT IN DISPUTE

I.    The Loan Repayment Program Contract

1.    Simone originally applied to participate in the LRP in May 1995. Pretrial

Statement ¶ 6[5] and Exhibit 4.

2.    At the time of his application, Simone listed approximately $76,500 in

qualifying educational loan debt. Pretrial Statement ¶ 7 and Exhibit 4.

---

[3] This version of the Act was in effect during the time relevant to this case. More recently, the Act was amended. Instead of requiring "any offense," the Act now requires "any felonious offense, or any of two or more misdemeanor offenses." 25 U.S.C. § 3207(b) (2000).

[4] The regulations were not in effect until 2002, three years after Simone resigned from IHS employment. However, the regulations help demonstrate the purposes of the Act and IHS' understanding of its responsibilities under the Act.

[5] The Joint Pretrial Statement included a Statement of Undisputed Facts and was submitted in compliance with this Court's standing Pretrial Order. Establishment of facts in the pretrial order makes those facts undisputed for purposes of a summary judgment motion. Capitol Records, Inc. v. Progress Records Distrib., Inc., 106 F.R.D. 25, 28 (N.D. Ill. 1985). In addition, both parties have stipulated to the facts recited in the Joint Pretrial Statement, subject to Simone's argument that certain facts were neither material nor relevant. As explained above, this Court overrules Simone's objections of relevance and materiality to the facts stated at pp. 8–11 of the Parties' Joint Pretrial Statement.

3.      IHS did not accept Simone into the LRP until 1998, when it notified him of

his acceptance in a letter dated January 30, 1998. Pretrial Statement ¶ 16 and Exhibit 13.[6]

4.      Simone executed the IHS Loan Repayment Program contract on February

12, 1998, and the Secretary's authorized representative countersigned the contract on

March 9, 1998. Pretrial Statement ¶ 17 and Exhibit 14.

5.      Under the contract, IHS promised to pay up to $78,600, including $60,000

for loan repayment and $18,600 for income tax liability. Pretrial Statement ¶ 18 and

Exhibit 14.

6.      In exchange, Simone promised, among other things: (a) to serve for a

period of two years in full-time clinical practice in an Indian health program; and (b) to

apply his loan repayment to his health professions educational loans. Pretrial Statement

¶ 20 and Exhibit 14.

7.      Simone also agreed that if he "breache[d] his[] contract by failing either to

begin, or complete, [his] period of obligated service in accordance with Section 108(f)

[codified at 25 U.S.C. § 1616a(f)], the United States shall be entitled to recover" the

amount determined by application of the statutory formula. Pretrial Statement ¶ 21 and

Exhibit 14. See also 25 U.S.C. § 1616a(*l*).

_____

[6] The letter erroneously gives the date of January 30, 1997, as the date Simone
was accepted into the program. However, the award was for fiscal year ("FY") 1998, as
indicated in the first paragraph. The determination to accept Simone into the LRP for FY
1998 could not have been made in January 1997, since that would have preceded FY
1998. In addition, the first paragraph requests a reply by February 27, 1998.

8.      Simone admits that he read the contract and was aware of his obligations and the result of any breach, including the repayment obligation and the unconscionability standard for discharge of that obligation. Simone Deposition 100–03.

9.      When Simone entered his LRP contract in March 1998, he had recently begun working as a Supervisory Clinical Psychologist at the Aberdeen Area Youth Regional Treatment Center ("AAYRTC"). Pretrial Statement ¶¶ 10, 13 and Exhibits 7, 10.

10.     Since he was already employed by IHS in a qualifying position, Simone's LRP contract became effective on March 9, 1998, the date the Secretary's authorized representative signed the contract. Pretrial Statement ¶ 17 and Exhibit 14.

II.    Simone's Employment at AAYRTC

11.     In November 1997, Simone began his position at AAYRTC with a temporary appointment. Pretrial Statement ¶ 10 and Exhibit 7.

12.     His appointment was changed to a career conditional appointment in January 1998. Pretrial Statement ¶ 13 and Exhibit 10.

13.     AAYRTC is an IHS facility that provides residential drug and alcohol treatment to adolescents from the ages of 13 to 17 who are enrolled as members of a Federally recognized American Indian tribes. Decl. of Tom Eaglestaff ¶ 2.

14.     As a Federal government employee, Simone's employment was subject to a background investigation. Decl. of David Azure ¶ 8.

15.    Simone's investigation began in November 1997, Exhibit 17,[7] upon receipt

of Simone's employment documents, including his completed "Declaration for Federal

Employment" ("Form OF-306"), Exhibit 8, and an "Addendum to Declaration for

Federal Employment, Indian Health Service, Child Care & Indian Child Care Worker

Positions" ("Addendum"), Exhibit 9.

16.    Simone completed a new Form OF-306 and Addendum in January 1998,

when his status was changed from a temporary appointment to career conditional.

Pretrial Statement ¶¶ 14, 15 and Exhibits 11, 12.

17.    On both of his completed Forms OF-306, Simone answered "no" to the

question, "During the last 10 years, have you been convicted, been imprisoned, been on

probation, or been on parole?" Pretrial Statement ¶¶ 11, 14 and Exhibits 8, 11.

18.    On both of his completed Addendums, Simone answered "no" to the

question, "Have you ever been found guilty of, or entered a plea of nolo contendere (no

contest) or guilty to, any offense under Federal, State, or tribal law involving crimes of

violence; sexual assault, molestation, exploitation, contact, or prostitution; or crimes

against persons?" Pretrial Statement ¶¶ 12, 15 and Exhibits 9, 12.

19.    On September 8, 1998, the United States Office of Personnel Management

("OPM") issued a "Report of Agency Adjudicative Action" to the IHS Human

Resources Office in South Dakota, in which OPM concluded that Simone's background

---

[7] The record shows the investigation began on November 3, 1997. Exhibit 17,
page 9.

12

investigation revealed "potentially actionable issue(s) which, standing alone, may be disqualifying under suitability/security considerations." Pretrial Statement ¶ 23 and Exhibit 17.

20.    As part of its investigation, OPM received an investigative report from the Federal Bureau of Investigation ("FBI") that included arrests for:

(1)    Simple Battery (April 18, 1971);

(2)    Aggravated Battery (September 7, 1971);

(3)    Aggravated Battery (September 8, 1971);

(4)    Aggravated Assault, Resisting Arrest, Attempted Auto Theft, Criminal Trespass to Vehicle (September 30, 1971);

(5)    Assault (November 3, 1971);

(6)    Burglary (October 16, 1974);

(7)    Trafficking in Dangerous Drugs, Trafficking in Marijuana (June 14, 1978);

(8)    Trafficking in a Controlled Substance (August 17, 1978);

(9)    Criminal Trespass to Land (December 5, 1979);

(10)    Criminal Damage to Property (June 28, 1984);

(11)    Patronizing a Prostitute (March 8, 1993); and

(12)    Battery (August 5, 1993).

Pretrial Statement ¶ 24 and Exhibit 17.

21.    The FBI report indicated Simone received sentences for four of the offenses:

13

(1)    September 30, 1971, Aggravated Assault ("140 days H of C Concurrent");

(2)    November 3, 1971, Assault ("sentence — 40 DAS");

(3)    June 14, 1978, Trafficking in Dangerous Drugs and Trafficking in Marijuana ("prison term"); and

(4)    August 17, 1978, Trafficking in a Controlled Substance ("prison term").

Pretrial Statement ¶ 25 and Exhibit 17.

22.    OPM also received a "Criminal History Record Information" from the Illinois State Police, which included the arrest for Aggravated Assault on September 30, 1971, and indicated a finding of guilt and sentence for that charge on November 3, 1972. Pretrial Statement ¶ 27 and Exhibit 17.

23.    Most recently, Simone has not contested this background investigation, at least as it pertains to his convictions for aggravated assault and assault in 1971 and for the drug convictions in 1978, and has indicated that to do so "would be absurd." Simone Deposition 130.

24.    The investigation also revealed that Simone pled guilty to the March 8, 1993, charge of patronizing a prostitute, for which he was placed on six months of court supervision. Pretrial Statement ¶ 28 and Decl. of David Azure ¶ 10. See also Exhibit 35.[8]

25.    In addition to the standard background investigation conducted for Federal employees, IHS must also determine if an employee who is in a position

---

[8] The record of the Circuit Court of Cook County indicates there was a "finding guilt [sic]" on March 30, 1993. Exhibit 35.

14

involving regular contact with or control over Indian children is suitable for

employment under the Indian Child Protection and Family Violence Prevention Act.

Decl. of David Azure ¶ 9. <u>See</u> <u>also</u> 25 U.S.C. § 3207 (1994 & Suppl. IV 1999).

26.    After completing its own investigation of Simone's background, the IHS

Human Resources Office in South Dakota issued a letter to Simone, dated January 5,

1999, requesting "clarification or an explanation" of the numerous charges. Pretrial

Statement ¶ 28 and Exhibit 18.

27.    Simone was familiar with this procedure, which included appeal rights,

since in his capacity as Supervisory Clinical Psychologist of AAYRTC, he had

previously been responsible for addressing unfavorable background investigations of

employees under his supervision. Simone Deposition p. 111, 119, 131.

28.    Simone responded in a letter dated January 20, 1999, explaining that he

had "no recollection" of the earliest incidents,[9] admitting that he received probation for

one of the 1978 drug charges, and stating that court supervision in the instance of the

patronizing a prostitute charge "is not a conviction."[10] Pretrial Statement ¶ 29 and

Exhibit 19.

_____

[9] More recently, Simone has admitted to the 1971 convictions for aggravated
assault and assault, explaining that there was a guilty plea and an agreement that if he
entered the military, his sentence would be limited to time served. Exhibit 26. Simone
Deposition pp. 129, 130.

[10]Although Simone continues to deny a conviction for this charge, the records of
the Circuit Court of Cook County show a "finding guilty [sic]" on March 30, 1993,
followed by six months of court supervision. Exhibit 35.

29.     The IHS Human Resources Office in South Dakota considered Simone's answer unsatisfactory. Decl. of David Azure ¶ 13.

30.     As a result, on February 12, 1999, the Human Resources Office notified Simone's supervisor, Tom Eaglestaff, the Director of the AAYRTC, that he should propose Simone's removal. Decl. of David Azure ¶¶ 13, 14, Decl. of Tom Eaglestaff ¶ 7, and Exhibit 32.

31.     Mr. Eaglestaff planned to present and discuss the proposed removal letter to Simone on February 17, 1999. Decl. of Tom Eaglestaff ¶ 8.

32.     The letter stated that Mr. Eaglestaff was proposing Simone be removed from his position and from federal service for four reasons, including: (1) failure to meet the eligibility requirements of Public Law 101-630; (2) violation of the Crime Control Act of 1990; (3) Falsification of Optional Form 306; and (4) Falsification of Addendum to Declaration for Federal Employment. Pretrial Statement ¶ 30 and Exhibit 20.

33.     When Mr. Eaglestaff raised the issue with Simone on February 17, 1999, Simone stated that he would resign. Decl. of Tom Eaglestaff ¶ 9 and Decl. of David Azure ¶ 16.

34.     Since Simone resigned, Mr. Eaglestaff never issued the letter of proposed removal, Decl. of Tom Eaglestaff ¶ 9 and Decl. of David Azure ¶ 16, and therefore, Simone had no basis for challenging any removal action since it was never taken. Decl. of David Azure ¶ 16.

16

35.     Had Simone not chosen to resign, Mr. Eaglestaff's letter of proposed

removal would have only been the first of multiple stages in the removal process, which

include: (a) issuance of a letter of proposed removal by the recommending official (Mr.

Eaglestaff); (b) acknowledgment, by signature, of receipt of the proposed removal by

the employee (Simone); (c) consideration of the proposed removal by the deciding

official, who allows the employee the right to respond to all allegations before a final

determination; (d) appeal of the deciding official's determination to remove to the Merit

Systems Protection Board ("MSPB"); and (e) appeal of an adverse ruling by the MSPB to

the United States Court of Appeals for the Federal Circuit. Decl. of David Azure ¶ 15.

36.     On the same day as their discussion, Simone submitted a resignation letter

stating that he was resigning due to "health and personal reasons" and indicating that

March 20, 1999, would be his final day at AAYRTC. Pretrial Statement ¶ 31 and Exhibit

21.

37.     On February 25, 1999, Mr. Eaglestaff notified Simone that, pending his

resignation, he would be restricted to administrative duties and would no longer have

access to the clinical areas of AAYRTC. Decl. of Tom Eaglestaff ¶ 11 and Exhibit 33.

III.    Terms of Breach in the LRP Contract

38.     On his last day of employment with IHS, March 20, 1999, Simone had

served a total of 376 days from the effective date of the contract, March 9, 1998. Pretrial

Statement ¶ 33 and Exhibit 29.

17

39.     He has not served with IHS since March 20, 1999. Pretrial Statement p. 8,

¶ 1 (questioned by Simone only for relevance and materiality).[11]

40.     Simone would not be eligible for employment in any position involving

regular contact with or control over Indian children due to the requirements of the

Indian Child Protection and Family Violence Prevention Act, and most providers in IHS

facilities, including psychologists, necessarily treat both adults and Indian children.

Decl. of David Azure ¶ 17. See also Exhibit 26 p. 2.

41.     In the one year Simone worked for IHS, the agency paid $39,300 of its

obligation under the contract, including a payment of $30,000 on June 2, 1998, to Simone

for loan repayment and a payment of $9,300 on December 30, 1998, on behalf of Simone

for his increased income tax liability. Pretrial Statement ¶ 19 and Exhibit 15.

42.     Simone did not use the $30,000 paid to him by IHS to repay his

educational loans. Pretrial Statement ¶ 37 and Simone Deposition pp. 105–06.

43.     On June 3, 2003, the LRP sought verification from Simone that he had

completed the two years of service required by his LRP contract. Pretrial Statement p. 8,

¶ 2 and Exhibit 23.

44.     On July 28, 2003, IHS informed Simone that he was at risk of defaulting on

his LRP obligation, as a result of his failure to serve with IHS for the two-year term

specified under the contract. Pretrial Statement p. 8, ¶ 3 and Exhibit 24.

---

[11] See pp. 8–11 of the Joint Pretrial Statement for facts that Simone questioned
only for relevance and materiality. References to the Joint Pretrial Statement for these
facts include both the page and the paragraph number.

45.     IHS also indicated that, if compliance with the contract was impossible or would involve an extreme hardship, Simone could request a waiver application. Pretrial Statement p. 9, ¶ 4 and Exhibit 24.

46.     On August 8, 2003, IHS received a request for a waiver application from Simone, in which he indicated that it "would cause an extreme hardship" to either complete his service obligation or to repay IHS. Pretrial Statement p. 9, ¶ 5 and Exhibit 25.

47.     On or around September 3, 2003, Simone submitted a completed application for waiver of his LRP obligation, "based on two considerations: (1) At the time of my separation and to the present time, it is impossible for me to continue to work for Indian Health Service or a Tribal agency, (2) Health considerations." Pretrial Statement p. 9, ¶ 6 and Exhibit 26.

48.     In his application for waiver, Simone included a tax return reflecting annual wages of $64,107 in 2002. Pretrial Statement p. 9, ¶ 7 and Exhibit 26.

49.     IHS considered Simone's application for waiver, pursuant to 25 U.S.C. § 1616a(m), which authorizes the Secretary to waive an obligation whenever: (1) "compliance is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable;" or (2) "in any case of extreme hardship or other good cause shown, as determined by the Secretary." Pretrial Statement p. 9, ¶ 8 and Exhibit 16.

50.     In its decision letter dated March 15, 2004, IHS notified Simone that it considered several factors, including his "present financial resources and obligations; . . . estimated future financial resources and obligations; and [t]he extent to which [he] has problems of a personal nature." Pretrial Statement p. 10, ¶ 9 and Exhibit 27.

51.     In the March 15, 2004 letter, IHS concluded that Simone did not qualify for waiver under the statute because his salary exceeded $60,000 and he had no physical disability that prevented him from working. Pretrial Statement p. 10, ¶ 10 and Exhibit 27.

52.     The March 2004 letter further instructed Simone to contact the Program Support Center, Debt Management Branch to make payment arrangements. Pretrial Statement p. 10, ¶ 11 and Exhibit 27.

53.     On August 11, 2004, the Debt Management Branch of the Program Support Center notified Simone of the repayment requirements for his debt, which totaled $104,358.94 at the time. Pretrial Statement p. 10, ¶ 12 and Exhibit 28.

54.     Due to the continuing accrual of interest, the amount owed as of May 1, 2007, was $124,462.92. Decl. of Barry Blum, ¶ 9.

55.     This includes a principal amount of $57,173.42, based on the statutory formula that incorporates the damages amount and gives credit for the amount of time served with IHS. Decl. of Barry Blum, ¶ 9.

56.     In addition, interest in the amount of $67,289.50 had accrued through May 1, 2007. Decl. of Barry Blum, ¶ 9.

20

57.     Interest will continue to accrue at a specified rate (currently 13.375%) until

the date of judgment, at which time the post-judgment rate (4.94% on April 6, 2007) will

apply. Decl. of Barry Blum ¶ 9.

IV.     Bankruptcy Proceedings

58.     Simone filed for bankruptcy in October 2005. Pretrial Statement ¶ 34.[12]

59.     This Court ordered a discharge on February 9, 2006. Pretrial Statement

¶ 35.

60.     On June 9, 2006, the Court ordered the bankruptcy case reopened. Pretrial

Statement ¶ 37.

V.     Simone's Current Financial Status

61.     Simone is currently 53 years old and single with no legal dependants.

Simone Deposition p. 84 and Depo. Exhibit 5.

62.     He is currently in good health. Simone Deposition 117–18.

63.     Simone has several educational degrees, including: an Associate in

Applied Sciences in Alcohol/Substance Abuse Counseling, a Bachelor of Arts, a Master

of Arts in Family Counseling, and a Doctor of Psychology. Exhibit 4.

64.     On April 12, 2007, Simone had a balance of $7,748.92 in his savings

account. Simone Deposition 32–33.

---

[12] This Court takes judicial notice of the contents of this case, number 05-94720.

A.     Annual Income for 2007

65.     Simone's annual income for 2007 will be more than $100,000. Simone

Deposition 49–50 and 62–63.

66.     This includes Simone's gross, bi-weekly salary of $3,107.38 ($80,791.88

annually) from his full-time position as the Director of Substance Abuse Services at the

Resolve Center of the Riverside Medical Center in Manteno, Illinois. Simone Deposition

62–63.

67.     Deductions from his biweekly check include $308 for retirement. Simone

Deposition 63.

68.     In addition, as part of his private psychology practice, Simone earns

approximately $28,500 annually from Kankakee County for counseling work with sex

offenders. Simone Deposition 49–50.

69.     This source of income accounts for the majority of the $29,775 he reported

as self-employment earnings in 2006. Simone Deposition 49–50.

70.     In his private psychology practice, he also conducts group counseling

sessions, which are attended by 9 to 11 persons, and his weekly income from the group

varies from $35 to $110. Simone Deposition 23–25.

71.     Simone also receives payments, totaling approximately $50 per week,

from three independent contractors who provide group therapy sessions in a building

he recently purchased for his private practice. Simone Deposition 22–23.

72.    Simone's 2007 income represents an increase over the gross income he reported on his Federal income tax return for 2006, which included a total income of $97,790 that consisted of $67,929 from his full-time position at Riverside Medical Center, $29,775 in self-employment income, $47 in interest, and $39 of taxable refunds. Simone Deposition 46–48 and Depo. Exhibit 3.

B.    <u>Newly Acquired Property</u>

73.    Simone purchased a new commercial property, located at 1357 West Station Street, Kankakee, Illinois, in May 2006. Simone Deposition 9–10, 13, 18–38.

74.    The property includes a two-story brick building with a residential unit in the basement and an additional building in the back. Simone Deposition 19–20.

75.    Simone furnished the residential unit for use by his adult daughter, her boyfriend, and her children, who live in the apartment without making any rental or other payments. Simone Deposition 20, 29–30, 42.

76.    Simone stated that he purchased the property both to provide his adult daughter a place to live and to conduct his private psychology practice. Simone Deposition 29.

77.    For the five to six years prior to purchasing the building, Simone conducted his private practice in rented office space that cost him $500 per month, including utilities. Simone Deposition 27.

23

78.     Simone admits that a private room and locking filing cabinet are sufficient for his private psychology practice, Simone Deposition 50–51, all of which was available in the facility he rented for $500 a month. Simone Deposition 27–29, 51.

79.     Despite that, he purchased the new commercial property, at a total monthly cost of $1,855.65, including: mortgage payment ($904.65), taxes ($300), insurance and utilities ($410), and a home equity loan on his residence that he used as the down payment on the commercial property ($241). Pretrial Statement p. 10, ¶ 16 and Simone Deposition 9–10.

80.     The only additional income that resulted from the purchase of this property is the payments Simone receives from the independent contractors who use the new commercial building, which payments total approximately $50 per week. Simone Deposition 22–23.

81.     The total purchase price for the new property, paid at the closing on May 12, 2006, was $125,500. Simone Deposition 9–10, 13, 38.

82.     This amount included the mortgage loan for $110,500 and Simone's down payment of $15,000, which he financed with a home equity loan on his residence. Simone Deposition 9–10, 13, 38.

83.     The current outstanding balance on the property's mortgage, as of April 12, 2007, is $107,905.48. Simone Deposition 37.

84.     The current outstanding balance of the home equity loan that Simone used to finance his down payment is $4,950.70. Simone Deposition 15.

24

85.     Thus, between June 2006 and March 2007, Simone has reduced the

original balance of his home equity loan from $15,000 to $4,950.70. Simone Deposition

12–17.

C.     <u>Residential Property</u>

86.     Simone also owns a residence, located at 1290 West Bourbonnais,

Kankakee, Illinois, which he originally purchased in November 2001 and refinanced in

April 2003 for $111,100. Simone Deposition 40.

87.     He values the property at $115,000. Simone Deposition 39.

88.     The current mortgage balance on this residential property, as of April 12,

2007, is $78,164.17. Simone Deposition 40.

D.     <u>2005–2006 Federal Income Tax Deductions</u>

89.     On his 2006 Federal income tax return, Simone reported charitable

deductions of $7,128. Simone Deposition 66, 85–86 and Deposition Exhibit 3.

90.     This amount included $5,678 in personal expenses that he incurred to

participate in an international footrace in Chile, South America, that was used to raise

money for a charitable organization in Kankakee, Illinois. Simone Deposition 66–73.

91.     Simone anticipates spending approximately the same amount to

participate in the same type of race in 2007. Simone Deposition 72–73.

92.     In 2005, Simone claimed $7,225 in travel expenses for optional trips to

Lithuania that were not required by his employer and for which he received no

compensation. Simone Deposition 91–92.

25

E.    Department of Education Loans

93.    Simone's payment on his DOE educational loans are currently in

deferment, which began in November 2006 and will continue until October 2007.

Simone Deposition 52–53, 56–59.

94.    Under the existing deferment program, Simone is eligible for three annual

deferments, and therefore, will be able to renew his deferment in October 2007. Simone

Deposition 56–59.

95.    Interest continues to accrue on the unsubsidized portion of his DOE loans,

and although Simone is not required to pay the interest while his loan is in deferment,

he claims that he paid approximately $3,848 in interest in 2006 and $1,764 thus far in

2007. Simone Deposition 52–53, 58–61.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any

material fact, and therefore, the movant is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(c); Bankr. Rules 7056, 9014; Johnson v. Ford Motor Credit Co. (In re

Johnson), 53 B.R. 919, 924 (Bankr. D. Ill. 1985) (relying on In re Manchester Lakes

Associates, 47 B.R. 798, 800 (Bankr. E.D. Va. 1985)). The moving party has the burden of

establishing that there is no genuine issue of material fact. Egger v. Phillips, 710 F.2d

292, 296 (7th Cir. 1983). Although any reasonable doubt regarding the existence of

disputed facts should be resolved in favor of the party opposing the motion,

Fitzsimmons v. Best, 528 F.2d 692, 694 (7th Cir. 1976), "[a] dispute on a collateral fact

will not forestall judgment." <u>Ohning v. Schneider Nat'l Transcontinental, Inc. (In re</u>

<u>Ohning)</u>, 57 B.R. 714, 715–16 (Bankr. D. Ind. 1986). Thus, "[t]o prevent the entry of a

summary judgment there must be a legitimate, bona fide dispute as to a fact which

affects the relative rights and obligations of the parties." <u>Ohning</u>, 57 B.R. at 715–16.  As

previously discussed, the parties agree that there is no dispute as to any material fact in

this case.

I.      Due to Simone's Failure To Fulfill His Obligations Under The LRP Contract,
        Simone Owes The United States $127,291.24 Under The Statutory Repayment
        <u>Obligation That Was Incorporated Into His LRP Contract</u>

Simone owes a debt to the United States, pursuant to the statutory repayment

obligation of 25 U.S.C. §1616a(*l*), which was incorporated into his LRP contract.

Exhibit 14 Sect. F(2). The United States is entitled to judgment as a matter of law.

Simone owes this debt since, and he has presented no factual or legal basis for this

Court to overlook Simone's statutory and contractual obligation. Although Simone

alleges that repayment is "unconscionable," the issue of unconscionability pertains to

the question of discharge, 25 U.S.C. § 1616a(m)(4), and not to the existence of the debt.

Simone's repayment obligation is required under both his LRP contract and 25 U.S.C.

§ 1616a(*l*).

A.    Simone Signed A Contract With The LRP, Promising To Serve Two Years
With IHS, To Use The Money He Received To Repay His Educational
Loans, and To Repay The United States If He Breached His Obligations
Under The Contract

Simone and the IHS Loan Repayment Program agreed to undertake certain

obligations, as signified by their signatures to the LRP contract in 1998. IHS promised to

issue payments totaling up to $78,600 to or on behalf of Simone, including loan

repayments and tax liability payments for each year Simone served with IHS. Pretrial

Statement ¶ 18 and Exhibit 14 Sect. A & P. 4. In exchange, Simone promised to serve

two years at a site in Wakpala, South Dakota, and to use the money he received to repay

his educational loans. Pretrial Statement ¶ 20 and Exhibit 14 Sect. B(1)–(2) & P. 4. In the

contract, the parties also defined breach of the contract and set forth the results of

breach. Pretrial Statement ¶¶ 21-22 and Exhibit 14 Sect. F. Thus, Simone agreed that, if

he failed to fulfill his obligations under the contract *for any reason*, he would be required

to pay the Secretary according to the statutory formula. Pretrial Statement ¶¶ 21–22 and

Exhibit 14 Sect. F(2).

B.    Simone Breached His Obligation Under The Loan Repayment Program
Contract, and Therefore, He Owes The United States A Debt Imposed By
His Contract and 25 U.S.C. § 1616a(*l*)

Simone admits that he breached two of his contractual obligations. First, Simone

breached his LRP contract by working only one year of his two-year service obligation.

Pretrial Statement ¶¶ 20, 33, Exhibit 14 Sects. B(2), F(2), P.4, and Exhibit 29. His period

of service under the LRP contract began on March 9, 1998, the date the contract was

28

signed by the Secretary's authorized representative. Exhibit 14 Sect. C & P. 4. His final

date of employment with IHS was March 20, 1999. Pretrial Statement ¶ 33 and p. 8, ¶ 1.

Thus, Simone served only 376 days under his LRP contract, from March 9, 1998, until

March 20, 1999. Pretrial Statement ¶ 33. Second, Simone also breached his LRP contract

by using the LRP money he received for something other than repayment of his

educational loans. Pretrial Statement ¶¶ 20, 37, Exhibit 14 Sects. B(1), F(1)(a)(4), and

Simone Deposition pp. 105–06.

> 1.    Simone Breached His LRP Contract By Failing to Fulfill His Two-
>        Year Service Obligation

Simone has not contested the fact that he failed to complete his two-year period

of service, as required under his LRP contract and the statute. Any excuse he attempts

to provide for his breach is irrelevant, since the LRP agreement and the statute impose

the repayment obligation on a participant who fails to complete his service "for any

reason:"

> If, *for any reason* . . ., an applicant breaches his/her written contract by
> failing either to begin, or complete, the participant's period of obligated
> service in accordance with Section 108(f) [codified at 25 U.S.C. § 1616a(f)],
> the United States shall be entitled to recover from the participant . . . .

Exhibit 14 Sect. F(2) (italics added). <u>See also</u> 25 U.S.C. § 1616a(*l*). A similar repayment

provision, 42 U.S.C. § 254*o*(b)(1), has been ruled to be "indifferent as to the reason why

an individual fails to begin performing his service obligation . . . ." <u>United States v.</u>

Gross, 725 F. Supp. 892, 894 (W.D. La. 1989).[13] As a result, once a participant in the

program is placed in default of his contract for failure to complete his service obligation,

"the service option terminates and the recipient must repay the debt financially." Gross,

725 F. Supp. at 894–95 (relying on United States v. Redovan, 656 F. Supp. 121, 126 (E.D.

Pa. 1986), and United States v. Martin, 710 F. Supp. 271 (C.D. Calif. 1989)).

Despite the language of his LRP contract and the statute, which both impose the

repayment obligation on a participant who breaches *for any reason*, Simone believes he

should be excepted from the repayment obligation because he claims it is not his fault

that he cannot complete his service. Simone seems to allege that it is the fault of IHS that

he is unable to fulfill the obligation, since he has been deemed unsuitable for

employment with the Agency and would have a difficult time obtaining a qualifying

position that would fulfill his obligation under the LRP contract. Although the United

States agrees that Simone's criminal background may make fulfillment of his service

obligation difficult, if not impossible, the Government also asserts that Simone is the

---

[13] Although the courts have yet to interpret many of the provisions that govern
the IHS Loan Repayment Program, including § 1616a(*l*), courts have interpreted the
often identical provisions of the scholarship and loan repayment programs of the
National Health Service Corps ("NHSC"), codified at 42 U.S.C. §§ 254*l*–254t. The NHSC
programs have a repayment obligation that is almost identical to that of the IHS Loan
Repayment Program:

> [I]f an individual breaches his written contract by failing (*for any reason*
> . . .) to begin such individual's service obligation . . ., to complete such
> service obligation, or to complete a required residency . . ., the United
> States shall be entitled to recover from the individual . . . .

42 U.S.C. § 254*o*(b)(1)(A).

only party that could have prevented his breach. Regardless, both the LRP contract and the statute impose the repayment obligation as a result of any breach.

Simone's breach occurred when he tendered his resignation on February 17, 1999. Pretrial Statement ¶ 31 and Exhibit 21. Even prior to that, however, Simone created the circumstances for his breach when he failed to disclose his criminal background on his employment application forms. Whether he failed to remember his criminal past, lacked comprehension of its relevance, or intended to withhold the information, Simone's non-disclosure of his criminal history placed him and IHS in a position that led to his resignation on February 17, 1999.

Once IHS received his background investigation from OPM, Simone's non-disclosure left IHS facing the mandate of the Indian Child Protection and Family Violence Prevention Act. As discussed above, the Act prohibits employment of certain individuals in positions that have regular contact with or control over Indian children. The prohibition is not punitive, but rather, serves the Act's purposes "to prevent child abuse and protect Indian children." <u>Johnson v. HHS</u>, 18 Fed. Appx. 837, 842 (Fed. Cir. 2001). To accomplish that purpose, Congress presumed the existence of a nexus between the minimum standards of character established by the Act and the goal of preventing incidents of abuse by Federal employees. <u>Johnson et al. v. Dep't of Health and Human Serv.</u>, 86 M.S.P.R. 501, slip op. at 2, 16 (M.S.P.B. 2000) (Final Decision). Thus, the Act sets forth "a bright line rule that anyone who has been convicted of an enumerated crime may not serve in a covered position." <u>Delong v. Dep't of Health and</u>

31

Human Servs., 264 F.3d 1334, 1343 (Fed. Cir. 2001). See also, Daugherty v. Thompson, 322 F.3d 1249, 1255 (10th Cir. 2003). "[G]iven the difficulty of identifying employees who pose a threat to Indian children, the choice of a blanket rule is justified in this case." Delong, 264 F.3d at 1343 (upholding the removal of an IHS employee who had one conviction from twenty-five years earlier and had served IHS for ten years without incident).

Simone's suitability under this provision was a condition for both his participation in the LRP, 25 U.S.C. § 1616a(b)(2), and for his federal employment as a psychologist at AAYRTC, 25 U.S.C. § 3207(a)(1) (1994 & Suppl. IV 1999), which is a residential treatment center for Indian youth ages 13–17. Decl. of Tom Eaglestaff ¶ 2. It is uncontested that Simone's position as the Supervisory Clinical Psychologist at the facility was one that involved "regular contact with, or control over, Indian children," as defined in 25 U.S.C. § 3207(a)(1) (1994 & Suppl. IV 1999). Therefore, due to Simone's criminal background, which includes convictions of or pleas to aggravated assault, drug trafficking, and patronizing a prostitute ( Exhibits 17, 26, and 35, and Simone Deposition pp. 129–130), the Indian Child Protection and Family Violence Prevention Act prohibited Simone's continued employment with IHS at AAYRTC.

Simone had experience with the removal process under the Act, since he had previously removed unsuitable individuals under his supervision. Simone Deposition p. 119. Based on this knowledge, Simone chose to resign from his position rather than proceed through the removal process, which includes the opportunity for appeal

32

through IHS, HHS, the Merit Systems Protection Board, and even Federal court. Decl. of

David Azure ¶ 15. Simone was also aware that many, if not most, IHS facilities and

clinical positions require that the clinicians necessarily treat both adults and Indian

children. Exhibit 26 p. 2. Therefore, he knew it would be difficult to identify a qualifying

clinical position in which he could fulfill his LRP service obligation.

These circumstances do not excuse Simone from the repayment obligation under

the LRP contract and 25 U.S.C. § 1616a(*l*). The statute requires repayment when a

participant fails to fulfill his service obligation *for any reason*. Simone's actions, and not

any action of IHS, subject him to this requirement. Simone's behavior — including his

agreement to the terms of the statute when he signed the LRP contract, his acceptance of

the loan repayment money, his failure to disclose his background, for whatever reason,

and his resignation — is the sole reason he is now subject to the repayment obligation

imposed under 25 U.S.C. § 1616a(*l*).

Simone's objections to the repayment obligation are unsupported in law. "[A]ll

courts that have considered the issue of whether the damages provision [codified at 42

U.S.C. § 254*o*(b)(1)(A)] is a penalty or unconscionable have rejected those contentions

and found the provision enforceable." <u>United States v. Hugelmeyer</u>, 774 F. Supp. 559,

562 (D. Ariz. 1991). <u>See also</u>, <u>United States v. Fowler</u>, 659 F. Supp. 624 (N.D. Cal. 1987)

("section 254*o*(b)(1) is an enforceable liquidated damages clause"), aff'd, 849 F.2d 1476

(9th Cir. 1988). Thus, the courts have upheld the contracts and statutory provisions as

"valid and enforceable," <u>Milwaukee Area Joint Apprenticeship Training Comm. v.</u>

33

<u>Howell</u>, 67 F.3d 1333, 1339 n.5 (7th Cir. 1995), and imposed the repayment requirement.

<u>See, e.g.</u> <u>United States v. Day</u>, 1996 U.S. Dist. LEXIS 7004, *13 (E.D. La. 1996) ("[t]he

many courts that have addressed Section 254$o$(b)(1) have held that the provision is not a

penalty or treble damages and that it is a valid enforceable liquidated damages clause");

<u>United States v. Dillingham (In re Dillingham)</u>, 104 B.R. 505 (Bankr. D. Ga. 1989); <u>United

States v. Padavano</u>, 664 F. Supp. 28, 30 (D. Me. 1987) ("the triple pay-back provision . . .

is a valid liquidated damages clause rather than an unenforceable penalty"); <u>United

States v. Turner</u>, 660 F. Supp. 1323 (E.D. N.Y. 1987); <u>Redovan</u>, 656 F. Supp. 121; <u>United

States v. Haithco</u>, 644 F. Supp. 63 (W.D. Mich. 1986); <u>United States v. Hayes</u>, 633 F.

Supp. 1183 (M.D. N.C. 1986); <u>and</u> <u>United States v. Swanson</u>, 618 F. Supp. 1231 (D. Mich.

1985).

The courts have relied on the principle that the relationship between a program

participant and the United States "does not arise from a negotiated agreement, but is

provided for by statute." <u>United States v. Becker</u>, 995 F.2d 779, 783 (7th Cir. 1993)

(relying on <u>Rendleman v Bowen</u>, 860 F.2d 1537, 1541–44 (9th Cir. 1988)). As a result,

"statutory intent is more relevant to interpret [an agreement's] conditions than

common-law contract principles." <u>Becker</u>, 995 F.2d at 783 (relying on <u>Rendleman</u>, 860

F.2d at 1541–44). <u>See also,</u> <u>United States v. Arron</u>, 954 F.2d 249, 251 (5th Cir. 1992);

<u>United States v. Melendez</u>, 944 F.2d 216, 219 (5th Cir. 1991) ("conditions imposed upon

an NHSC scholarship recipient arise from statutory directives, not from a negotiated

agreement between the parties"); <u>Hugelmeyer</u>, 774 F. Supp. at 561 ("statutory intent,

34

rather than general contract principles govern the interpretation of the relationship

between the Secretary of Health and Human Services and the scholarship recipient");

United States v. Nayden, 1990 U.S. Dist. LEXIS 8134, *16 (N.D. Ind. 1990) ("contract

defenses are not valid since the rights and duties of the parties are governed by statute,

and not common law contract principles," relying on Rendleman, 860 F.2d at 1541–42);

and Rendleman, 860 F.2d at 1542 ("the plain language of the statute demonstrates that

Congress did not intend that contract principles govern the interpretation of the

relationship between the Secretary and a scholarship recipient").

　　　In upholding the repayment provisions, the courts have emphasized Congress'

purpose for creating the programs. For example, the purpose of the NHSC program is

to encourage health care providers "to set up practice in areas that have traditionally

been deprived of access to adequate medical services," and not merely to finance a

student's education. United States v. Duffy, 879 F.2d 192, 198 (6th Cir. 1989). Similarly,

the IHS Loan Repayment Program is intended to "assure an adequate supply of trained

health professionals necessary to . . . provide health care services to Indians." See 25

U.S.C. § 1616a(a)(1). When considering these purposes, it becomes clear that "the

service obligation was intended to be one not easily avoided." Melendez, 944 F.2d at 219

(relying on Rendleman, 860 F.2d at 1541). Therefore, the courts have upheld the full

statutory repayment amount, explaining that Congress may have even intended to

impose an excessive penalty for breach by a participant in order to discourage breach

and ensure fulfillment of the program's purpose of bringing quality care in under-

served areas and to under-served populations. See, e.g., Duffy, 879 F.2d at 198.

Even when the Government may have contributed to the debtor's default, the

courts have upheld the repayment obligation. Such claims have been "rejected as not

material." United States v. Williams, 864 F. Supp. 305, 312 (E.D.N.Y. 1994). As a result,

courts have upheld the repayment obligation against a dentist who was terminated

after negative performance appraisals, United States v. Noel, Adversary No. 89-00176A,

Case No. 689-00451 (Bankr. W.D. Va., May 16, 1990), and a scholarship recipient who

claimed she was unable to perform due to the agency's failure to place her in a suitable

facility, Williams, 864 F. Supp. 305.

The case law has upheld the application of statutory repayment provisions. In

doing so, the courts have rejected allegations of the unconscionability of such

provisions, refused to apply contract defenses, and considered allegations of

Government misconduct to be immaterial. Simone has presented no factual or legal

challenge to override his contract, the statute, and the findings of these courts.

Therefore, he owes a debt to the United States for the statutory repayment obligation

incorporated into his LRP contract.

> 2.    Simone Breached His LRP Contract By Misusing The Money and
>        Not Using It To Repay His Educational Loans

Simone also breached his LRP contract by using the LRP money he received for

something other than repayment of his educational loans. Pretrial Statement ¶ 37 and

Simone Deposition pp. 105–06. The LRP gives awards for "the principal, interest, and related expenses on government and commercial loans received by the individual regarding the undergraduate or graduation education of the individual," including tuition expenses and other "reasonable educational expenses." 25 U.S.C. § 1616a(g)(1). Simone agreed "[t]o accept loan repayments" from the Secretary and "to apply such payments only to outstanding eligible health professions educational loans." Exhibit 14, page 2. Despite both the statutory and contractual provisions that require application of the money to his educational loans, Simone readily admits that he did not apply the $30,000 he received toward his educational loans. Pretrial Statement ¶ 37 and Simone Deposition 105–06. This is a separate violation of his LRP contract and the statute, and therefore, a second breach.

For these reasons, judgment is hereby entered in favor of the United States against Simone, declaring that he owes the United States under the statutory repayment obligation, in the amount of $127,291.24, plus post-judgment interest.

II.    Simone's IHS Debt Should Not Be Discharged In Bankruptcy Because He Cannot Satisfy The Unconscionability Standard Required For Discharge Under 25 U.S.C. § 1616a(m)(4)

The Court also hereby refuses to discharge this debt in bankruptcy because Simone has alleged no facts that meet the unconscionability standard required under 25 U.S.C. § 1616a(m)(4) for discharge of the repayment obligation. In fact, in preparing the Joint Pretrial Statement, Simone did not contest any facts proposed by the Government, but only disputed the relevance and materiality of certain facts — the facts that pertain

to his ability to repay the debt. As discussed above, those objections are overruled.

Simone has not asserted an inability to repay.  Summary judgment also is granted in

favor of the United States, denying discharge, since the debtor has provided no

evidence and made no effort to show how nondischarge of the debt incurred from his

LRP obligation would be unconscionable, as required for discharge of the obligation

under 25 U.S.C. § 1616a(m)(4).

> B.   Simone Cannot Meet the Standard of Unconscionability for Discharge,
> Which Requires Him To Prove That Nondischarge of The IHS Debt Would
> Be "Excessive, Exorbitant," "Lying Outside the Limits of What Is
> Reasonable or Acceptable," "Shockingly Unfair, Harsh, or Unjust," or
> "Outrageous"

The standard for discharge of Simone's repayment obligation is governed by the

unconscionability standard of 25 U.S.C. § 1616a(m)(4) rather than the Bankruptcy Code.

25 U.S.C. § 1616a(m)(4), United States v. Green (In re Green), 82 B.R. 955, 957 (N.D. Ill.

1988) ("The law in this Circuit is unequivocally clear. The dischargeability in

bankruptcy of HEAL loans is governed by 42 U.S.C. § 294f(g) rather than by any

provision of the Bankruptcy Code")[14] (relying on In re Johnson, 787 F.2d 1179 (7th Cir.

---

[14] As explained in note 12, the courts have yet to interpret many of the provisions
that govern the IHS Loan Repayment Program. However, the courts have considered
the similar bankruptcy discharge provision that governs the Health Education
Assistance Loans ("HEAL") program, currently codified at 42 U.S.C. §§ 292–292p. Prior
to 1992, the HEAL program was codified at 42 U.S.C. §§ 294–294*l*-1. See 102 Public Law
408.

The HEAL program, as well as the NHSC program discussed above, both have
provisions comparable to the LRP discharge standard contained in § 1616a(m)(4). The
HEAL discharge provision states:

1986)). See also, United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991) ("The

dischargeability of a HEAL loan is governed by 42 U.S.C. § 294f(g)"); and Hines v.

United States (In re Hines), 63 B.R. 731, 734 (Bankr. D.S.D. 1986) ("the Court holds 42

U.S.C. § 294f(g), and not 11 U.S.C. § 523(a)(8), is paramount for determining HEAL

student loan dischargeability"). Therefore, Simone bears the burden of proving to this

Court that nondischarge of his debt would be unconscionable. Rice v. United States, 78

F.3d 1144, 1149 (6th Cir. 1996) (finding that the debtor bears the burden of proving

unconscionability in his claim for discharge).

The unconscionability standard is a high standard that is "significantly more

burdensome than the 'undue hardship' standard used to discharge educational loans."

United States v. Ascue (In re Ascue), 268 B.R. 739, 744 (W.D. Va. 2001). See also, In re

---

Notwithstanding any other provision of Federal or State law, a debt that is
a loan insured under the authority of this subpart may be released by a
discharge in bankruptcy under any chapter of title 11, only if such
discharge is granted — . . . (2) upon a finding by the Bankruptcy Court
that the nondischarge of such debt would be unconscionable . . . .

42 U.S.C. § 292f(g)(2). The NHSC discharge provision states:

Any obligation of an individual under the Scholarship Program (or a
contract thereunder) or the Loan Repayment Program (or a contract
thereunder) for payment of damages may be released by a discharge in
bankruptcy under title 11 . . . only if the bankruptcy court finds that
nondischarge of the obligation would be unconscionable.

42 U.S.C. § 254*o*(d)(3)(A).

39

Woody, --- F.3d ----, 2007 WL 2110808 at *6 (10th Cir., July 24, 2007)[15] ("a court may not

utilize its discretion to overcome Congress's requirement that debtors seeking discharge

of HEAL loans meet a strict unconscionability standard. 'Given the extreme nature of

Congress' chosen standard for the discharge of HEAL loans, we believe that in all but

the most difficult cases the question of whether the debtor has satisfied that standard

will be obvious,'" relying on Rice, 78 F.3d at 1148–50); Wood, 925 F.2d at 1582–1583 (7th

Cir. 1991) ("the requirements of section 294f(g) are more stringent than those" required

for undue hardship); United States v. Rice, 182 B.R. 759, 761 (N.D. Ohio 1994)

("unconscionability poses a significantly more burdensome standard than the 'undue

hardship' standard"); Green, 82 B.R. at 959; and Hines, 63 B.R. at 736 ("unconscionable

under Section 294f(g)(2) requires a higher standard than a finding of undue hardship").

The standard of unconscionability applies the ordinary usage of the term, which is

"'excessive, exorbitant,' 'lying outside the limits of what is reasonable or acceptable,'

'shockingly unfair, harsh, or unjust,' or 'outrageous.'" Matthews v. Pineo, 19 F.3d 121,

124 (3rd Cir. 1994) (citing Webster's Third New International Dictionary 2486 (1977)).

See also, Rice, 78 F.3d at 1148–49. Due to the high standard, a finding of

unconscionability will be rare. Rice, 78 F.3d at 1150; and United States v. Smitley, 347

F.3d 109, 118 (4th Cir. 2003).

---

[15] On September 13, 2007, this Court allowed the United States' motion to cite In re Woody, --- F.3d ----, 2007 WL 2110808 (10th Cir., July 24, 2007), a subsequently decided case, as additional authority for its Motion for Summary Judgment. Docket Entry ## 74 and 72.

In determining whether Simone has met his burden of showing that nondischarge of his repayment obligation would be unconscionable, the Court "evaluat[es] the totality of the facts and circumstances." Ascue, 268 B.R. at 744; and In re Woody, --- F.3d ----, 2007 WL 2110808 at *5–6.  The Court's evaluation includes "objective factors" such as Simone's: 1) educational background, 2) professional degree, 3) income, 4) earning ability, 5) health, 6) accumulated wealth, 7) dependants, and 8) age. Ascue, 268 B.R. at 744–45; and Rice, 78 F.3d at 1149. Another important factor is Simone's "past efforts to repay the loan, including . . . the debtor's acquisition of new financial burdens contemporaneous with the [] debt." Ascue, 268 B.R. at 744–45. See also, In re Woody, --- F.3d ----, 2007 WL 2110808 at *11 (concluding that the debtor's failure to make at least minimal payments shows a lack of good faith and that "a debtor's good faith efforts at repayment over the life of his loans are an important part of an unconscionability analysis"); Clark v. United States Dep't of Educ. (In re Clark), 341 B.R. 238, 255–56 (Bankr. D. Ill. 2006) (discussing a good faith effort to pay as a condition for meeting even the undue hardship standard for discharge); and Rice, 78 F.3d at 1150 ("we believe the debtor's good faith to be an appropriate and necessary consideration," based on the requirement that "the debtor show he has made good faith efforts to repay the loans") (relying on Brunner v. New York State Higher Educ. Serv. Corp., 831 F.2d 395, 396 (2d Cir. 1987), which required a showing of good faith even for the lower discharge standard of undue hardship). Courts have also considered the size of the debt, the rate at which interest is accruing, and the extent to which the debtor's

41

circumstances are likely to continue or improve. Ascue, 268 B.R. at 744–45; and Rice, 78

F.3d at 1149. Finally, the courts have "ascertain[ed] whether the debtor has attempted to

minimize the expenses of himself and his dependents" and "to maximize his income."

Rice, 78 F.3d at 1149–50. See also, Brunner, 831 F.2d at 396 (holding that even the lower

undue hardship standard requires the debtor to show that he cannot maintain a

"minimal" standard of living if forced to repay the loans); and Matthews, 19 F.3d at 124.

> B.    The Evidence Shows That Nondischarge of Simone's Repayment
>        Obligation To The United States Would Not Be Unconscionable Under
>        § 1616a(m)(4)

Simone has failed to prove any facts that support a finding that nondischarge of

his debt to the United States would be unconscionable. He has not even alleged an

inability to repay the obligation. A review of the factors laid out by the courts show that

such allegations, if made, are unsupported by Simone's current financial situation. The

totality of his circumstances show that Simone is financially able to repay this debt. In

fact, even with his current expenditures, Simone has the financial ability to pay $474.84

per month toward his repayment obligation to the United States. Decl. of Barry Blum ¶

10. By reducing his discretionary spending, Simone could afford to repay his obligation

according to the amortized repayment options for either 15 years ($1,007.20 per month)

or 20 years ($817.28 per month). Decl. of Barry Blum ¶ 12.

1.    Objective Factors: Educational Background, Professional Degree,
Income, Earning Ability, Health, Accumulated Wealth,
Dependants, and Age

The objective factors considered by the courts show that nondischarge of

Simone's debt would not be unconscionable. Simone is highly educated with multiple

degrees, including a Doctor of Psychology. Exhibit 4. He is currently practicing in his

professional field as a psychologist. Simone Deposition 23–25, 49–50, 62–63. He will

earn a combined salary of more than $100,000 in 2007. Simone Deposition 49–50 and

62–63. He does not suffer from any health problems that would interfere with his ability

to repay his obligation. Simone Deposition 117–18. In addition, Simone owns two

properties: 1) his residence, which he values at $115,000 and for which his mortgage

balance is $78,164.17 (Simone Deposition 39–40), and 2) a commercial property, which

he purchased for $125,500 in May 2006 and for which he currently owes $112,856.18

including $4,950.70 on the home equity loan on his residence. Simone Deposition 9–10,

13, 18–38. He also has $7,748.92 in his savings account. Simone Deposition 32–33.

Finally, Simone is only 53 years old, and therefore, he has sufficient time with which to

repay the debt. Simone Deposition 84. None of these objective factors show that

nondischarge would be unconscionable.

2.    Past Efforts to Repay the Debt, Including Acquisition of New
Financial Burdens

Simone's attorney acknowledged during his oral argument on September 13,

2007, that Simone has never made a payment toward his repayment obligation. This

43

failure to even attempt repayment suggests an unwillingness, rather than inability, to

do so. This conclusion is supported by Simone's actions since this Court granted his

general bankruptcy discharge on February 9, 2006. In May 2006, three months after this

Court granted Simone's general bankruptcy discharge, Simone purchased a new

commercial property, at a total monthly cost of $1,855.65. Pretrial Statement p. 10, ¶ 16

and Simone Deposition 9–10. Although Simone uses this building for his private

psychology practice, as well as to provide an apartment for his adult daughter, he was

able to conduct his professional practice in a rented space, for only $500 per month, for

a period of five to six years. Simone Deposition 27–29, 51. Simone's purchase of this

new commercial property since his general bankruptcy discharge has resulted in

additional monthly expenses of $1,300 above the amount he was previously paying for

the same purpose. Simone Deposition 9-10, 27-29, 50-51; Pretrial Statement p. 10 ¶16.

This is a "self-imposed and excessive liability" that demonstrates Simone's lack of good

faith. <u>Clark</u>, 341 B.R. at 255–56 (finding that a self-imposed hardship, in that case a new

automobile, shows bad faith even under the lower undue hardship standard for

discharge of a debt).

Based upon the facts and law applicable to this case, Simone cannot justify

discharge because he has never acted in good faith to pay his IHS repayment obligation.

3.   <u>Attempts to Minimize Discretionary Expenses</u>

Simone's expenditures show that he has not attempted to reduce discretionary

payments, but rather, has used significant resources for such payments. For example,

44

Simone has had the resources to pay in excess of his minimum monthly mortgage payments in order to pay down his mortgage from $110,000, the amount for which he refinanced it in April 2003, to $79,000 in April 2007. Simone Deposition 39–40. This is a total of $31,000 in payments on the principal in four years. In addition, in the eleven months since he initially purchased the new commercial building in May 2006, Simone has made payments in excess of his minimum monthly payments on the home equity loan on his residential property, which he used as the down-payment for the new commercial property. Simone Deposition 9–10, 13, 18–38. As a result of those excess payments, Simone has reduced the balance on that loan from $15,000 to $4,950.70, a reduction of $10,049.30 in the principal over eleven months. Simone Deposition 9–10, 13, 18–38.

Simone also has significant discretionary expenditures to charity. Simone reported $7,128 in charitable deductions on his 2006 Federal income tax return. Simone Deposition 66, 85–86 and Deposition Exhibit 3. This amount included $5,678 of personal expenses related to participating in an international footrace in Chile, South America, which was used to raised money for a charitable organization in Kankakee, Illinois. Simone Deposition 66–73. Simone anticipates spending approximately the same amount on the same type of race in 2007. Simone Deposition 72–73. In 2005, Simone also had discretionary travel costs in the amount of $7,225 for optional trips he made to Lithuania, even though he received no compensation for making those trips and the trips were not required by his employer. Simone Deposition 91–92.

As another example of discretionary costs, Simone deducts $308 from his bi-weekly salary for contribution to his retirement plan. Simone Deposition 63. Although retirement savings is desireable, it is neither essential to Simone's well-being nor unconscionable to require Simone temporarily suspend these contributions in order to repay his debt. See Anes v. Dehart (In re Anes), 195 F.3d 177, 180–81 (3rd Cir. 1999) ("[v]oluntary contributions to retirement plans are . . . are not reasonably necessary for a debtor's maintenance or support"); and Harshbarger v. Pees (In re Harshbarger), 66 F.3d 775, 777 (6th Cir. 1995). See also, In re Cornelius, 195 B.R. 831, 835 (Bankr. N.D. N.Y. 1995); In re Cavanaugh, 175 B.R. 369, 373 & n.3 (Bankr. D. Idaho 1994); In re Fountain, 142 B.R. 135, 137 (Bankr. E.D. Va. 1992); and In re Festner, 54 B.R. 532, 533 (Bankr. E.D. N.C. 1985).

Simone's elimination or reduction of any or all of these discretionary payments would enable him to minimize his monthly expenses, thereby freeing his income so that he can repay his obligation to the United States more quickly. The availability of such additional funds shows that nondischarge of the IHS repayment obligation would not be unconscionable.

4.      Other Factors

Finally, Simone alleges that he is unable to pay the IHS repayment obligation because of the amount he owes to the United States Department of Education for his educational loans. His assertion of his DOE debt as a bar against paying the LRP repayment obligation is especially problematic because Simone's DOE debt would be

much lower had he applied the money he received from the IHS Loan Repayment Program to his educational loans. Simone would have significantly reduced the principal amount owed to DOE if he had used the $30,000 he received from the LRP for its intended purpose. In addition, he would have avoided the interest that has accrued on that $30,000 since June 1998, when Simone received the LRP money from IHS. Furthermore, Simone's DOE educational loans are currently in deferment, and therefore, he is not required to make any payments on these loans. Simone Deposition 52–53, 56–59.

Discharge of the IHS repayment obligation in order to accommodate Simone's repayment of his DOE loans would create an odd precedent by allowing a debtor to discharge a debt with a high standard of unconscionability for discharge in order to pay another debt with a lower standard for discharge. Educational loans owed to DOE may be discharged upon a finding that nondischarge would impose an "undue hardship" on the individual. 11 U.S.C. § 523(a)(8). As already discussed, courts have widely held that the unconscionability standard, which must be met to discharge the obligation Simone owes under 25 U.S.C. § 1616a, is significantly higher than that of undue hardship. For these reasons, Simone's DOE loans cannot be used to show that nondischarge of his LRP repayment obligation would be unconscionable.

###